IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


UNITED STATES OF AMERICA,        ) 6:15-CR-00341-2-AA

                    Plaintiff,   )

     v.                          )

ROBERT ALLEN CUMMMINS,           )

                    Defendant.   )


SENTENCING HEARING

February 14, 2017

9:14 A.M.

```
 1                          APPEARANCES

 2

 3    For the Plaintiff:

 4          Nathan J. Lichvarcik

 5          UNITED STATES ATTORNEY'S OFFICE

 6          405 East Eighth Avenue, Suite 2400

 7          Eugene, Oregon 97401

 8          541-465-6771

 9          nathan.j.lichvarcik@usdoj.gov

10

11    For the Defendant:

12          John Joseph Kolego

13          KOLEGO & KRAUSHAAR, ATTORNEYS AT LAW, INC.

14          834 Pearl Street, Suite 101

15          Eugene, Oregon 97401

16          541-484-1066

17          johnkolego@gmail.com

18

19    Reported by:

20          Sara Fahey Wilson, CSR, CCR

21          Certified Shorthand Reporter

22

23

24

25
```

1          Tuesday, February 14, 2017

2                9:14 A.M.

3          P R O C E E D I N G S

4                * * * * *

5

6          THE COURT:  Good morning.  Please be

7     seated.

8          THE CLERK:  Now is the time set for

9     the hearing in the matter of United States of

10    America versus Robert Allen Cummins.  Case Number

11    6:15-CR-00341.  Time set for sentencing.

12          MR. LICHVARCIK:  Good morning, Your

13    Honor.

14          THE COURT:  Good morning,

15    Mr. Lichvarcik.

16          MR. LICHVARCIK:  Judge this is -- it's

17    not your typical federal gun case that walks into

18    the Eugene courthouse.  As Your Honor knows, the

19    typical gun case generally is someone who is

20    prohibited from processing guns, has a criminal

21    history varying degrees of significance, has been in

22    and out of the prison system and then they are

23    caught with the gun.  That's the more typical gun

24    case.

25          This case is what I kind of categorize

1    loosely as a white collar gun case.  And Your Honor

2    actually has several of them pending in this

3    courthouse, and each of them has a different unique

4    aggravating factor or factors.

5              The aggravating factors around this

6    case is that, you know, just plainly speaking, it's

7    an international arms trafficking case.  And I'll

8    talk about Defendant's role in that because I do

9    think it's probably on the lower end of the

10   culpability when compared to some of the other folks

11   involved, but that's what it is.

12             And the general -- well, some of the

13   general similarities of what I call these white

14   collar gun cases are that the defendants don't have

15   a criminal history and they tend to have more

16   familiarity with the firearms laws, and therefore

17   they are able to take extra steps that allow them to

18   try to mask their criminal behavior.

19             And it's effective, because these

20   kinds of cases are hard to investigate and they are

21   hard to prove because a lot of the reliance on the

22   federal firearms laws in the United States, frankly,

23   relies on the honesty of the purchasers and the

24   sellers of guns, relies on the honesty of the

25   Federal Firearms Licensed dealers -- the FFL's --

1   who are engaging in the transactions.  They are

2   typically the first line of defense for these cases.

3   So they are hard to investigate.  They are hard to

4   prove.

5                   But back to the aggravating factors.

6   You know, Mr. Cummins, he straw purchased the gun so

7   his culpability -- he's kind of on the lower end of

8   the totem pole.  I don't have reason to think that

9   he knew, probably, the scope of the people that he

10  got involved with.  I think he knew or had reason to

11  think that they were up to some -- up to no good,

12  but I'm not sure that he knew the scope of who he

13  was dealing with.

14                  But when he walked in to that FFL and

15  plopped down a little over $38,000 in firearms and

16  bought a lot of significant fire power, that's a

17  serious offense.  Because I know some people see

18  these straw purchases as just paper offenses, lying

19  and buying, they are called sometimes, lying on the

20  forms, and it's kind of easy to diminish it as just

21  a simple lying case.

22                  But I think this case highlights how

23  significant they can actually become, because it's

24  no surprise that these guns that Mr. Cummins and

25  Mr. Flores purchased -- because Mr. Flores was

1    purchasing other guns too -- you know they weren't

2    showing up down at hunting lodges in the hands of

3    farmers down in Mexico.  This is a coordinated

4    effort by cartels to come up here and purchase

5    firearms, and that's what Mr. Cummins found himself

6    in the middle of.

7                    So straw purchasing are serious

8    offenses.  And straw purchasing comes in a variety

9    of -- you know, what it is is basically, as Your

10   Honor knows, walking in and lying on the form that

11   you're the actual purchaser when, in fact, the guns

12   are intended for someone who wishes to remain in the

13   shadows.

14                   And generally speaking, the person who

15   wishes to remain in the shadows does not want to

16   have their name associated with these guns, they are

17   up to no good.

18                   And as Your Honor knows from, I think,

19   my sentencing memo, the PSR, these guns were pretty

20   much straw purchased and immediately serial numbers

21   ground off and transported straight down south of

22   the border.

23                   But -- so taking into account the

24   factors that I've listed in my sentencing memo, and

25   in the motion that I've tendered to the Court, in

 1    considering everything and his relative culpability,

 2    the parties are jointly agreeing to a 40-month

 3    sentence.

 4                    And I move to dismiss Count 25 of the

 5    indictment.  Absent any questions, Judge, that's all

 6    I have.

 7                    THE COURT:  Mr. Kolego?

 8                    MR. KOLEGO:  Mr. Cummins is 57 years

 9    old.  He grew up here in Eugene.

10                    THE COURT:  You're going to have to

11    speak up because I'm having trouble hearing you and

12    I know the court reporter will probably stop you in

13    a minute.

14                    MR. KOLEGO:  Mr. Cummins is 57 years

15    old.  He grew up here in the Eugene/Springfield area

16    his entire life.  His family on both sides are early

17    pioneers.  He's grown up working -- he started

18    working picking fruit when he was 12 years old.

19    He's worked really hard all his life.

20                    And he's -- as I indicated in my

21    sentencing memorandum, he's not stupid but he's a

22    simple man.  He's a simple man who enjoys things

23    like cars, and he's a fishing guide and a hunting

24    guide, and he's a former logger, and drives a tow

25    truck, scraps metal, and has saved and worked hard

1    all his life.

2             He got -- he got involved with weapons

3    because a friend of his from Salem who is a federal

4    firearms dealer had him helping out at a gun show.

5    He met the co-defendant here, the more culpable

6    individual who is wanted at this point, Mr. Flores,

7    at a gun show in Portland.

8             And Mr. Flores passed a background

9    check -- purchased a weapon, passed a background

10   check, and some of the weapons that have been seized

11   subsequent to this were purchased by Mr. Flores in

12   his own name.

13            So Mr. Cummins should have known that

14   there was something seriously wrong here.  He got

15   caught up in the venture of buying guns and the

16   novelty of these weapons and committed a really

17   serious mistake.

18            And he's somebody that doesn't have a

19   substantial criminal history.  He has family members

20   here and friends from many, many years who would

21   like to just give the Court an idea of what kind of

22   person he is, but he's a nonviolent person who did

23   something incredibly stupid and put instruments of

24   destruction out into the stream of commerce without

25   really thinking about the downstream effect of it.

1          And he's -- when the search warrant

2    was served, all his life savings -- he had pulled

3    his money out of Liberty Bank when he had heard that

4    it was going to be broke.  He maintained a lot of

5    his money in a safe at home, and all his assets were

6    seized.

7          And Mr. Cummins didn't respond

8    appropriately.  Didn't hire an attorney.  Waited.

9    The 90 days had run by the time he filed a claim so

10   he was -- he's been asking for mitigation of

11   forfeiture and the ATF is only willing to give him

12   about 25,000 back so he stands to lose about

13   $400,000 as a result of his activities and his,

14   frankly, just not wanting to face this because it's

15   just -- it's too overwhelming for him.

16          He's deeply repentant.  He's not going

17   to do anything like this again.  He's been perfect

18   on pretrial.  I don't think that there have been any

19   issues.  He doesn't use drugs.  He doesn't drink.

20   If anything, he's a workalcoholic.  And he has

21   really stepped in a big mess here.

22          He's here to accept responsibility.

23   And I don't know if the Court wants to hear from

24   family members or friends.

25          THE COURT:  I'd be happy to.  If you

1    would introduce them, that would be helpful.

2                    MR. KOLEGO:  Okay.

3                    One of his friends is Norm Chase, a

4    lifelong resident from Chase -- part of the Chase

5    Gardens family and has known Mr. Cummins for a long

6    time.

7                    THE COURT:  If you'd come forward up

8    to this podium.  Once you're there, state your full

9    name for the court reporter and then I'd be happy to

10   hear anything you want to say.  Please speak slowly.

11                   MR. CHASE:  My name is Norm Chase.  I

12   was born here in Eugene.  I've been here all my

13   life.  I would like to speak for Mr. Cummins.  I've

14   known him all my life.  30 years we've been friends.

15   He's about the same age as my daughter and so I've

16   kind of feel like he's one of my children and part

17   of my family.

18                   But I watched him work during the

19   years when he was a guide at the river.  I'll speak

20   fully for him.  He's a responsible person.  Like his

21   attorney spoke of him not drinking, he doesn't hang

22   out at bars.  He himself has not used drugs.  I

23   mean, he's just a really allover good person.

24                   I feel that he fell off the wagon and

25   went astray.  I don't know why.  I can't speak for

```
1   him there or what's in his mind, but there's an
2   error there.  And actually I am a Mason.  I've been
3   here 50 years.  I'm a Schriner.  I help people.  I
4   take kids up to Portland to the Schriners Hospital,
5   and I speak of helping many people.  I want to help
6   him too.
7               I figure that he's stepped aside.  I
8   think if anything goes wrong I think he should be on
9   probation rather than give him a sentence because I
10  don't think he deserves it.  He has no intent of
11  harming people.  He doesn't hang out anywhere with
12  gangs.  I can only speak positive for him.
13              I met him through his mother.  My wife
14  and he went to -- or she went to LCC together, and
15  so I've had Christmas dinners with him for 30 years
16  and I'll speak highly of him.
17              I think he -- can't say why he went
18  astray, but I figure he wants to go back on that
19  wagon and I think that he deserves a second chance.
20  I don't think he is dangerous.  He just an all right
21  good person.
22              Is there any questions you want to ask
23  me?
24              THE COURT:  No.  Thank you.
25              MR. CHASE:  Thank you.
```

 1          MR. KOLEGO:  This is Melba Cummins.

 2    She's Mr. Cummins' mother, and she just wants to

 3    talk about how hard he's worked all his life.

 4          MS. DUNAHOE:  As he just said, I'm

 5    Melba Cummins Dunahoe.  My husband, his father, has

 6    passed away and I remarried.

 7          But Robert has worked since he was

 8    five years old.  He's sold seeds door-to-door.  When

 9    he was six he started picking berries and selling

10    them to a local resort.

11          So he was -- first grade, and the bus

12    driver was given the privilege of picking up

13    children all the way down the McKenzie River and she

14    would take them to Junction City to pick

15    strawberries.  He lasted the whole season picking

16    strawberries, and he usually won the bus driver's

17    coupons for the berries she had picked because he

18    was -- acted better and behaved better than the

19    other kids.

20          So Robert has always worked.  And I

21    didn't have problems with him, so he kind of got led

22    astray by friends because he never had guns when he

23    was a kid.  He was afraid of them.  And he found out

24    that he had gotten in the middle of something that

25    he didn't know he was getting into, I guess, plain

1   and simple.

2               But I would really hope that he gets

3   some of the money back because he -- like I said,

4   he's worked for money since he was five years old,

5   so he had saved his money.  And we had already

6   talked to a real estate lady about selling his

7   house -- he only has an acre -- and he needs more

8   property -- smaller house and more property.

9               But I hope you take into consideration

10  he has family support and we depend on him.  He

11  supplies me with a car.  If he can't do my mechanic

12  work, he has his friends do it for me.  He helps me

13  on my house.

14              And both of his great-grandparents

15  were very early homesteaders, and I still have a

16  house next to my great-grandparents' homestead.  And

17  Robert shovels the snow off my roof and does

18  maintenance for me, and I really, like a lot of

19  people, depend on him.

20              So we're sorry he ended up in this,

21  but that is not the norm for Robert.  He's never

22  been a drinker, a druggie, and I'm very proud of

23  him.  Thank you.

24              THE COURT:  Thank you.

25              MR. KOLEGO:  One last thing that I

```
 1    wanted to add, Your Honor.  In Mr. Lichvarcik's
 2    sentencing memorandum he indicates that Mr. Cummins
 3    said something about being on the other side of
 4    legal or -- and really what that is, less of a
 5    disrespect for law but more of the grow up without
 6    governmental help and without -- and kind of a
 7    self-reliance and, in a way, ignoring government
 8    regulations, which is not really contemptuous to
 9    authority but just a way that -- a way of thinking
10    that's -- and especially in a complex interconnected
11    society.
12                  But he does have respect for law, and
13    he's -- he's mortified that he's here.  And I know
14    he wants to address the Court.
15                  THE COURT:  Mr. Cummins, you've --
16                  MR. KOLEGO:  One other person, Craig
17    Stauber, if I could, Your Honor.
18                  THE COURT:  Sure.
19                  MR. KOLEGO:  Craig Stauber.
20                  THE COURT:  Please state your name and
21    spell your last for the court reporter.
22                  MR. STAUBER:  My name is Craig
23    Stauber.  I'm from Salem, Oregon.  Anyway, is that
24    enough?
25                  THE COURT:  How do you spell your last
```

1    name?

2                    MR. STAUBER:  S-T-A-U-B-E-R.

3                    I've been a friend of Robby's for

4    about 40 years, and he is a really, really super

5    hard worker.  In fact, he really cares a lot about

6    people.  He's always there to help people.  He's

7    really -- how do I say that? -- he's really going

8    through a rough time right now through all of this

9    right now, and he's just -- something he's never

10   been through, of course, but it's very difficult for

11   him to go through.

12                   But, you know, as far as the

13   background on him, he's just a great guy and a hard

14   worker, and we pray for him, and hopefully you have

15   the courtesy to weigh all this out.  But thank you.

16                   MR. KOLEGO:  And I'll have Mr. Cummins

17   address the Court, Your Honor.

18                   THE COURT:  Mr. Cummins you've read

19   the presentence report and the documents presented

20   for this sentencing?

21                   THE DEFENDANT:  Yes, ma'am.

22                   THE COURT:  And any additions or

23   corrections you want to call the Court's attention

24   to?

25                   MR. KOLEGO:  Any additions or

1   corrections?

2             THE DEFENDANT:  No, Your Honor.

3             THE COURT:  I'm happy to hear anything

4   you wish to tell me.  Anything you want to tell me?

5             THE DEFENDANT:  Your Honor --

6             THE COURT:  You can stand up, or if

7   it's easier to sit down and talk into the mic, I'm

8   fine with that.

9             THE DEFENDANT:  I would prefer to

10   stand, Your Honor.

11             THE COURT:  You can just and speak up

12   loud.

13             THE DEFENDANT:  Okay.  Is that good?

14             THE COURT:  Yep.

15             THE DEFENDANT:  I'm sorry, Your Honor.

16   I'm going to have to go slow on this.  I apologize.

17             THE COURT:  No, please.  That's

18   helpful to the court reporter.

19             THE DEFENDANT:  I do take full

20   responsibility for my actions and that I apologize

21   to you and to citizens and to the people of Eugene

22   for doing that.

23             I had met a gentleman that was an FFL

24   through a friend of mine that introduced me to what

25   I thought were things that were cool and traveled to

1   a few gun shows with him and thought that it was

2   kind of a neat thing, cool thing, something I hadn't

3   seen and been involved in, known of, and introduced

4   me to something that I could -- that he thought

5   would be cool if I would buy a certain thing.

6                   And if I bought this a gun, he was

7   always like, "Wow, that's neat that you had that,"

8   and it made me kind of feel important in my eyes

9   that him and a few of his friends and a few of my

10  friends would be like, Oh, you have a something, and

11  it made me feel kind of strong in stature.

12                  I'm a very hard worker.  Go to work

13  early.  Get home early.  Have a good group of

14  friends, and in their eyes they thought it was a

15  neat deal and it me seem kind of a little bigger

16  than I should have been.  I so apologize for that.

17                  I didn't realize at the time of the

18  involvement and how far this had progressed.  And,

19  again, I'm sorry for that.

20                  This gentleman, Mr. Flores, that I had

21  contact with and had sold a few weapons to, I

22  believe from looking at paperwork I had not had any

23  involvement with him for close to a year.  I had

24  realized in my mind that something was not right and

25  would not respond or have any contact with him and

1  had moved forward away from him or anyone else that

2  had any involvement with my friend Matt Miller who

3  was the one that had introduced me to weapons.  I

4  didn't have contact with Matt anymore.

5           The day ATF came to my house I

6  continued working hard.  It was a way for me to try

7  to forget.  I let 90 days slip on the money, which

8  that was my fault, but all I wanted to do is just

9  work, get back to the woods, get back to the river

10  guiding, and I let the 90 days slip, which took my

11  life savings from me that I had worked for as a

12  young boy growing up in McKenzie Bridge.

13           My great-grandparents homesteaded.

14  They raised my grandparents there.  They raised my

15  mother there.  My mother raised us there.  My father

16  and grandfather were fishing guides so I've been a

17  fishing guide.

18           I just wanted to get back to work and

19  try to forget.

20           Since the time that I was indicted

21  I've worked every day.  I take a few days off, but I

22  work every day as a guide.  I have a towing

23  business, I have a metal recycling business, and I

24  have an auto dealership.

25           I visit friends and family upon, you

 1    know, any downtime, but working for me is second

 2    nature.  It's something I've done my entire life.  I

 3    want to try to get this behind me as quick as

 4    possible, continue running my businesses.

 5                    I have a rental house.  I own my own

 6    home.  I have commercial property I rent.  I want to

 7    get this behind me and move forward and make my mom

 8    proud again.

 9                    I'm sorry.

10                    THE COURT:  I want to thank you for

11    your very heartfelt look back at what happened and a

12    little insight as to what you were caught in.  You

13    know -- can I just say something?  You're like one

14    of the lucky people in the world.  There aren't many

15    people who get to grow up on the McKenzie Bridge,

16    have that kind of a family support, and come out the

17    other end and be able to be -- have your life work

18    guiding people on the river.

19                    THE DEFENDANT:  Yes, ma'am.

20                    THE COURT:  You get paid to be in

21    nature and in beauty.

22                    THE DEFENDANT:  My father, everybody

23    knew him by "Whitey."  His name was Richard Cummins

24    but everybody knew him by "Whitey."  And the funny

25    story is, is my drift boats have on the side --

 1    truck drivers have the name on the side of a truck

 2    that says "Bob" or "Bill" or "Joe."  My boat says

 3    "Whitey's kid."

 4                    THE COURT:  And Mr. Kolego is an

 5    artful lawyer, and he has laid this out in a way

 6    that I -- I understand.  You know, I'm a

 7    second-generation Oregonian as well.  I understand

 8    what it means to you when you talk about it.

 9                    But what I have to tell you is your

10    naivete and your -- I just have to say this -- lack

11    of self-esteem to be seeing yourself as a bigger

12    person because you bought some kind of a gun that

13    you really aren't ever interested in -- right?  You

14    don't shoot it, do you?

15                    THE DEFENDANT:  No, ma'am.

16                    THE COURT:  If your mom is accurate,

17    you really had no interest in hunting?

18                    THE DEFENDANT:  I did not, ma'am.

19                    THE COURT:  Right.  So it's a thing --

20    a shiny thing that does a lot of damage.  And why

21    would that make you feel better about yourself?  You

22    should feel as full as a human being can be just to

23    be able to give the gift of taking people down the

24    river.  You know how many people are stuck in jobs

25    that aren't remotely luxurious?

1          Yeah, it's hard work.  All of it's
2    hard work.  You do a lot of hard work things.  But
3    what you got yourself trapped into and what you
4    don't know is you don't know where all those guns
5    were going and whose lives might be ended because
6    all these guns are loose and not traceable and
7    responsible.  And that damage is incredible.
8          It's the -- they pray on people --
9    these guys pray on people who will just accept a
10   little friendship or a little attention, and you
11   were just -- your gut should have said something is
12   wrong.  I just wish at 57 your gut -- you would have
13   said to one of your friends, "Does this seem right
14   to be doing this?"  Or ask somebody.
15              THE DEFENDANT:  Yes, ma'am.
16              THE COURT:  One of the adult things
17   you have to learn is to ask for help.
18          And another issue is the whole waiting
19   the 90 days and losing your life savings.  That's a
20   maturity question.  These are wake-up calls for you.
21   I hope the government will -- Mr. Lichvarcik can, in
22   some way, get them to be more cooperative or
23   understand or appreciate when somebody who doesn't
24   have any contact with the criminal justice system
25   and doesn't really sort of understand it sort of

1    ignores, sort of, the rules of the road, so to

2    speak, which you do.  I read your presentence

3    report.

4              So there's some things you just don't

5    do, and you didn't do, and it got you into trouble.

6    Right?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  I don't necessarily think

9    you have a bad intent.  I just think, number one,

10    you don't take care of business and you think you

11    can either get away with it or you just don't need

12    to do that.  There's some reason.  When, basically,

13    if you just take care of your business you'd be back

14    out on the river and you'd have that $400,000 in

15    some safe place and you'd be moving on with your

16    next projects.

17              But, you know, that's not what today

18    is about, because what a sentencing is is holding

19    you accountable and then giving you hope.  I think

20    the most powerful thing you have is you have a

21    tremendous support network and what your mom and

22    your -- Mr. Chase and your good friend of 40 years

23    had to say is they are there for you and they were

24    there for you and they would have been there for you

25    if you would have asked.

1           THE DEFENDANT:  Yes.

2           THE COURT:  And by not asking you're

3    here today and going to be held accountable.

4                Now, Mr. Lichvarcik could have just

5    said, Your Honor, I recommend the low end of the

6    guidelines, but this is a negotiated case with your

7    attorney, Mr. Kolego, so the guidelines range is 70

8    to 87 months.

9                These are significant offenses, and

10   they are significant for a book I'm going to ask you

11   to read.  Do you like to read?

12           THE DEFENDANT:  Yes, ma'am.

13           THE COURT:  I think it will open your

14   eyes.  It's called "Dreamland."  It's about the

15   cartel, the money and the guns for the cartel.  It's

16   about the pharmaceutical industry.  It's about

17   opioids.  It's about the rust belt of the United

18   States and what we've done with drugs, guns, and

19   opioids, because you're now part of that.

20               I don't think that was your intent,

21   but you're part of that.  You're part of letting

22   people come up here and put our entire country at

23   risk.  I want you to read that because I think you

24   will come back, and what I'd like you to do -- I'm

25   going to look at this order pretty carefully -- I'd

1    like you to figure out how to give back.  You do

2    anyway, but I think you need to get out and work

3    with people who don't have necessarily as much as

4    you have.

5              And you have a lot to offer and to

6    show people.  I have a lot of confidence you're

7    going to do a lot of good with your life when you

8    come back, so I want you to -- what I want you to do

9    is thank the people that supported you.  I want you

10   to take the responsibility for this sentence and the

11   bad decision and turn it into something even better,

12   and go up there and take a look at that prison and

13   realize how blessed and lucky you are for the life

14   you've had and the opportunities you've had and that

15   you can come back and make a difference for other

16   people who don't have what you had.

17             But you pay your dues, and you'll be

18   given that second chance to come back.  And you,

19   unlike so many other people coming out of prison,

20   you will have the support network to make a

21   difference.  And then stop and think about what's

22   important to you.

23             It really doesn't matter if you don't

24   think well enough of yourself and you look for

25   outside praise for buying a dazzling object.  That's

 1      not -- you need to maybe think about looking at

 2      building different kinds of relationships or getting

 3      outside yourself and helping other people and

 4      feeling good about something you do for somebody

 5      else.

 6                      But to think that buying a gun or

 7      buying a bigger gun or a more powerful gun or one

 8      you can't -- a rare one that's really way illegal to

 9      own -- that that means anything.  What you're doing

10      is you're putting into commerce things that are

11      going to hurt people and that are going to be out

12      there to change how we live.

13                      You know, it's almost scary.  I'm just

14      going to tell you this.  I worry about going into

15      the woods anymore because there are a lot of weapons

16      out there that are not regulated and a lot of people

17      that things that aren't really healthy.  And why is

18      it that we're letting that happen?  It's people who

19      innocently make a decision to just help somebody out

20      by passing guns in an underground commercial market.

21                      Guns -- we have the Second Amendment,

22      but we also -- it's a privilege to have that.  It's

23      a privilege, and we regulate it for a reason.

24                      So please start being part of the

25      solution.  When you read that book, write me and let

 1    me know if you got it.  I think you can be part of

 2    the discussion.  Because there are a lot of people

 3    out there that don't understand what we deal with in

 4    this courtroom every day because that's not their

 5    world.  But the rule of law is the rule of law, and

 6    so that's what I'm doing today is enforcing the rule

 7    of law.

 8                    And the rule of the -- over here side

 9    deals shadow commercial enterprise, unregulated,

10    when they are dangerous such as they are, we're

11    going to hold people accountable for violating those

12    rules.  So you just -- you're smart enough to make

13    those choices down the road, and I hope you will do

14    that.  And I hope your family understands that the

15    thought with which your lawyer and Mr. Lichvarcik

16    put into this case speaks volumes, all right, and

17    has given you a benefit in this case.

18                    But the other piece I'm going to tell

19    you about is shame.  I know you are standing there

20    horribly ashamed feeling terrible about your family

21    and friends and yourself and your mother and all of

22    that.  Shame is only going to wreck the rest of your

23    life.  Stand up and let everybody know you took

24    responsibility today.  You made a mistake.  You're

25    going to be held accountable.  And you're going to

1    walk through the rest of this sentence with your
2    head up and getting most of it done without
3    difficulty.
4                    And while you're in prison you're
5    going to help other people.  When you come out you
6    will resume your life and you will move on.  Don't
7    be ashamed of being held accountable for a mistake
8    you made because you stood up, took responsibility,
9    entered a guilty plea, you've come here to
10   sentencing, you've apologized, and you're moving
11   forward.  That's what adults do.
12                   All right?
13                   THE DEFENDANT:  Yes, ma'am.
14                   THE COURT:  So the Court finds that
15   the total offense level is a 27.  The criminal
16   history is a 1.  It results in an advisory
17   guidelines range of 70 to 87 months.
18                   I've looked at the factors in 18 U.S.
19   Section 3553, nature and circumstance of this
20   offense -- I think I've covered how serious it is --
21   your own criminal history and characteristics.
22                   I just have to say, as Mr. Kolego I
23   think really artfully captured you, is you're just
24   one of those guys that sometimes the rules might be
25   made for other people and you don't follow them so

1    there's -- the thing that jumped out at me was the

2    fact that you got held in contempt for not paying

3    child support.  Tell me about your relationship with

4    your child.

5                    MR. KOLEGO:  Do you have a

6    relationship with your child?

7                    THE DEFENDANT:  Yes.  Skyler.

8                    THE COURT:  Right.

9                    THE DEFENDANT:  I got behind on the

10   child support.  I did end up paying Tracy off at

11   that time and continued to make payments on time

12   every month.

13                   THE COURT:  And so what is your

14   relationship -- is Skyler a boy or girl?

15                   THE DEFENDANT:  He's a boy.

16                   THE COURT:  And how old is he?

17                   THE DEFENDANT:  He is about 21 years

18   old.  He's here in Eugene off of River Road.

19                   THE COURT:  He's what?

20                   THE DEFENDANT:  He's here in Eugene

21   off River Road on Irving.

22                   THE COURT:  How often do you see him?

23                   THE DEFENDANT:  I see Skyler about

24   once every two weeks.

25                   THE COURT:  So when you come

 1    back -- maybe while you're in custody you could be a

 2    huge role model to him and make sure he pursues some

 3    education and you keep him going because that's the

 4    loss that you have is losing time with him.

 5                    THE DEFENDANT:  Yes, ma'am.

 6                    THE COURT:  So be the role model when

 7    you come back about following the rules and staying

 8    out of trouble --

 9                    THE DEFENDANT:  Yes.

10                    THE COURT:  -- because in so many ways

11    you should be a huge role model for him.

12                    The goals of punishment -- the goals

13    of sentencing, punishment, deterrence,

14    rehabilitation, community safety, and other factors

15    that the Court deems important in fashioning a

16    reasonable but not greater than necessary sentence

17    in this case, it's important to know that there is

18    somebody else who has a higher level of

19    responsibility and more culpability and is going to

20    be sentenced to a greater amount.

21                    So we when we look at sentencings, I

22    know the lawyers try to fashion a sentencing that's

23    commensurate with the role and responsibility for

24    similarly-situated individuals, and so I know that's

25    carefully thought out.

1          I also know how tenacious Mr. Kolego

2    can be, and on your behalf he has entered into a

3    recommendation which I find the fact that both

4    lawyers have made that recommendation to be an

5    important factor in a reasonable but not greater

6    than necessary sentence.

7          So I'm going to follow the

8    recommendation and impose, with regard to Count 1,

9    8, 11, 13, and 26, to be committed to the Bureau of

10   Prisons for a period of 40 months on each count to

11   be served concurrently with one another.

12         Upon release from confinement you will

13   have a three-year term of supervised release.

14   During the term of supervised release you have terms

15   and conditions set by the Court, general terms, and

16   you will have a supervising probation officer, and

17   then you will have the following seven special

18   conditions.

19         First, you will file a true and

20   accurate income tax return to the IRS by the 15th of

21   April each year, and you must submit a copy of that

22   tax return to the probation office as directed.

23         Second, you will maintain proper

24   debit, credit, and receipts for all business

25   transactions, and you must make and provide these

1 | records to probation as directed.

2 | Next, you shall maintain a single

3 | checking account and/or savings account in your name

4 | only.  You must deposit into this account all

5 | income, monetary gains, or other pecuniary proceeds

6 | and make use of this account for payment of all your

7 | expenses.  And you must disclose the account to your

8 | probation officer.  Any other account as well.

9 | Number four, you must provide to the

10 | probation office access to any requested financial

11 | information, authorize the release of any financial

12 | information form as requested.  The probation office

13 | may share that financial information with the U.S.

14 | Attorneys Office.

15 | You must not -- employment is subject

16 | to approval by your probation officer.  We know your

17 | lines of work.  If there's any problem with that,

18 | you can certainly ask for a hearing and the Court

19 | will make a final determination.

20 | You will observe reentry court when

21 | you return from custody.  It will, I think, provide

22 | you a good support network and some tools and

23 | resources.  And if you choose to be admitted, it

24 | allows you the opportunity to get a year off your

25 | supervision.  It will be up to you, and you have to

 1    be apply and be accepted.

 2                And finally, you will submit your

 3    person, property, house, residence, vehicle, papers

 4    or office to a search by the U.S. probation officer.

 5    And if you fail to do that, that will be considered

 6    a violation.

 7                I'm not imposing a fine making the

 8    finding you have no financial resources.  The money

 9    has already been at this point forfeited.

10                And I'm, again, hopeful Mr. Lichvarcik

11    and your lawyer may be able to call upon them to

12    give you an opportunity to at least contest that.

13                There's a fee assessment of $100 for

14    each count of the conviction for a total of $500

15    due.

16                And then finally, you entered into a

17    waiver of appeal rights, so if you wish to file a

18    notice of appeal, you may do so, but your plea

19    agreement governs your appeal rights.

20                And you understand that.  Correct?

21                THE DEFENDANT:  Yes.

22                THE COURT:  Recommendations?

23                MR. KOLEGO:  Sure, Your Honor.  And we

24    wanted to talk about a report date because he's

25    trying to wrap up his businesses.

1          THE COURT:  That's fine.

2          MR. KOLEGO:  And his request is

3    somewhat unusual.  I'm his advocate, and I'll ask.

4    He wanted eight months to wrap everything up.  And

5    he's been perfectly compliant with pretrial and he

6    needs as much time as the Court will give him.

7          And I'll have you address that if you

8    will.

9          THE DEFENDANT:  Yes, ma'am.  I own and

10   operate R.W. Towing and Goshen Recycling and

11   Towing --

12          THE COURT:  Okay.

13          THE DEFENDANT:  -- Goshen Recycling

14   and Towing, Cummins Guide Service, and Goshen Auto

15   Sales.  I also own my own home.  I have a rental

16   home and a rental commercial piece of property.

17          And I'm asking if you'd be so kind as

18   to give me eight months to get my home in condition.

19   One is it took an extreme hit to the roof from tree

20   branches of the ice storm of December 14th.  No

21   roofing companies right now are even taking

22   appointments.

23          And to try to shut down or find who

24   will be possibly a co-owner or could run my

25   businesses, take over the rental property and the

 1    commercial property, if you'd be so kind to do that

 2    for me.

 3              I've been very compliant with Nick and

 4    Juan Gonzales in pre trial.  Both spoke on my behalf

 5    that they wouldn't have an issue if you would be so

 6    generous to do that for me.  I'm not a risk.  I can

 7    guarantee you that.

 8              MR. LICHVARCIK:  Judge, I want

 9    Mr. Cummins to be able to take care of his affairs.

10    One of the reasons that I've agreed to postpone the

11    sentencing which I think was originally for December

12    was for these reasons.  I'd ask that it be 90 days

13    for him to be able to take care of the rest of his

14    affairs.

15              THE COURT:  Let's look at this case in

16    July.  Let's set a hearing date for reporting and

17    see where you are.  Get as much done as you can, and

18    we'll have a status conference then.

19              I don't usually do this lengthy a

20    time, and there's part of me that says you need to

21    get started and get it over with.

22              THE DEFENDANT:  Yes, ma'am.

23              THE COURT:  But I actually have

24    confidence that you will understand that I'm trying

25    to get you to move it along here and have you

 1    back -- have you start this sentence.

 2                    There's a great risk that if you don't

 3    cooperate with me I will reopen this or I will find

 4    you -- yeah, I think you understand what I'm saying.

 5                    THE DEFENDANT:  Yes, ma'am.

 6                    THE COURT:  There's a lot of risk.

 7    And I'm actually confident that you will do what you

 8    say you're going to do.  And if you get it done

 9    faster, better for you to get started on this

10    sentence.

11                    THE DEFENDANT:  Thank you.

12                    THE COURT:  Pick a date.

13                    THE CLERK:  July 11th, 9:00 a.m.

14                    THE COURT:  And that's just a date to

15    see where we stand.  Or if he gets it wrapped up

16    sooner, then it can be a report date.

17                    THE DEFENDANT:  Thank you, Your Honor.

18                    THE COURT:  Anything else?

19                    MR. LICHVARCIK:  Two other things,

20    Judge.  I'll move to dismiss Count 25.

21                    And also just so the record reflects

22    it correctly later on, I think Your Honor said the

23    advisory guideline range is 70 to 87 months, which

24    is what it is, but there's also a statutory maximum

25    of 60 months for the offenses, so under, I think,

1    guideline 5G it's actually a 60-month --

2                    THE COURT:  60-month sentence.  You're

3    right.  Thank you.

4                    Mr. Cummins, when you walk out of here

5    today appreciate that you've got a whole set of

6    obligations to me.  Is there anything you need to be

7    helpful -- that we can provide that will make it

8    more likely than not that you'll be successful on

9    this sentence?

10                   THE DEFENDANT:  No, Your Honor.

11                   THE COURT:  So you know to ask.

12   Right?  You've got a good lawyer, you've got

13   pretrial, and you will have a great probation

14   officer assigned to this case.  Just start asking

15   for help.

16                   And I want to thank your family for

17   being here.  This is a very hard day on a mom.

18   Second hardest day of what a mother could face.  I

19   think you need to honor what you said today, and if

20   you do that, you'll be one of those individuals who

21   comes and pays their debts and moves on and gives

22   back, so good luck.

23                   THE DEFENDANT:  Thank you.

24                   (The hearing was concluded

25                    at 9:56 a.m.)

1    UNITED STATES DISTRICT COURT      )

2    FOR THE DISTRICT OF OREGON        )

3

4         I, Sara Fahey Wilson, CSR No. 06-0400, a
     Certified Shorthand Reporter, certify:

5
          That the foregoing proceedings were taken before
6    me at the time and place therein set forth, at which
     time the witness was put under oath by me;

7
          That the testimony of the witness, the questions
8    propounded, and all objections and statements made
     at the time of the examination were recorded

9    stenographically by me and were thereafter
     transcribed;

10
          That a review of the transcript was not
11   requested;

12        That the foregoing is a true and a full and
     correct transcript of said proceedings reported by
13   me to the best of my ability on said date;

14        I further certify that I am not a relative or
     employee of any attorney of the parties, nor
15   financially interested in the action.

16        IN WITNESS WHEREOF, I have set my hand this 25th
     day of September 2023, in the City of Eugene, County
17   of Lane, State of Oregon.

18

19

20

21       _Sara Fahey Wilson_

22   Sara Fahey Wilson, CSR

23   CSR No. 06-0400

24   Expiration Date:  March 31st, 2026

25